AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

LODGED
CLERK, U.S. DISTRICT COURT

**4/17/25**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MRV _____ DEPUTY

for the

Central District of California

United States of America

v.

KATRINA WOODS,

Defendant(s)

FILED
CLERK, U.S. DISTRICT COURT

04/17/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ GR _____ DEPUTY

Case No.    2:25-mj-02310-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 30, 2025 in the county of Los Angeles in the Central District of California,

the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1040 | Fraud in Connection with Major Disaster or Emergency Benefits |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Roxanna Dale, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    April 17, 2025

_____
*Judge's signature*

City and state:    Los Angeles, California

Hon. Karen Stevenson, U.S. Magistrate Judge
*Printed name and title*

AUSA: S. Arkow x6975

## **AFFIDAVIT**

I, Roxanna Dale, being duly sworn, declare and state as follows:

### I.  **INTRODUCTION**

1.    I am a Special Agent with the Department of Homeland Security Office of Inspector General ("DHS-OIG") and have been so employed since January 2013. I am currently assigned to the Los Angeles Field Office, where I investigate matters concerning public corruption, fraud, waste, abuse, civil rights abuse, and Whistleblower Retaliation, as it relates to DHS employees, contractors, grantees, and programs. I have been employed as a Special Agent with the DHS-OIG since January 2013. I have received approximately 12 weeks of instruction in the fundamentals of law, ethics, interviewing, report writing, firearms, surveillance, defensive tactics, and case management at the Federal Law Enforcement Training Center in Glynco, Georgia.

2.    I have received many hours of additional training pertaining to the above topics while on the job and through agency specific training programs. I have received instruction in the identification, collection, and preservation of evidence, photography, and fingerprint collection. I have conducted numerous criminal investigations, including compiling information, interviewing victims, witnesses, and suspects, and collecting evidence. I have collected information to support the filing of criminal complaints and search warrants. Through the course of my employment with the DHS-OIG, my primary

responsibility is to investigate allegations of criminal, civil, and administrative misconduct involving DHS employees, contractors, grantees, and programs, including, but not limited to, bribery and corruption, financial crimes, misuse of law enforcement databases, theft of government property, narcotics smuggling, use of force incidents, wire fraud, and sexual assault.

3.   Prior to joining the DHS-OIG, I was a Fish and Wildlife Inspector assigned to the U.S. Fish and Wildlife Service ("USFWS"), Office of Law Enforcement, in San Diego, California, from January 2011 to January 2013, where I was responsible for generating information using investigative techniques including conducting inspections/seizures/interviews/ interrogations pertaining to the imports and exports of wildlife resources at the international ports of entries, examining physical evidence, and consulting law enforcement computer databases.

4.   Prior to joining the USFWS, I was a Special Agent with the National Oceanic and Atmospheric Administration, Office of Law Enforcement, in Long Beach, California, from August 2006 to January 2011, where I was responsible for investigating civil and criminal violations of wildlife smuggling and commercial fishing statutes, and import/export of federally protected wildlife resources. Additionally, I served as a trainer for interns and outreach volunteers. I have experience and training in the use of confidential sources and undercover officers, physical surveillance, electronic surveillance, the execution of

search and arrest warrants, telephone toll analysis, the arrests of violators, and the analysis of seized records, physical evidence, and taped conversations.

## II. **PURPOSE OF AFFIDAVIT**

5.   This affidavit is made in support of a criminal complaint against, and arrest warrant for, Katrina Woods ("WOODS") for a violation of 18 U.S.C. § 1040 (Fraud in Connection with Major Disaster or Emergency Benefits). This affidavit is also made in support of a warrant to search the person of WOODS (the "SUBJECT PERSON"), as described more fully in Attachment A.

6.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 287 (False Claims), 1028A (Aggravated Identity Theft), 1040 (Fraud in Connection with Major Disaster or Emergency Benefits), 1341 (Mail Fraud), and 1343 (Wire Fraud) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

7.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  **SUMMARY OF PROBABLE CAUSE**

8.   An investigation conducted by DHS-OIG has revealed that WOODS submitted a fraudulent application to the Federal Emergency Management Agency ("FEMA") for disaster relief benefits associated with wildfires that destroyed a large number of structures (and caused other damages) in the Los Angeles area in January 2025. The application claims that WOODS resided at 2060 N. Lake Avenue, Altadena, California 91001 ("2060 N. Lake Avenue") and requested that FEMA disburse funds into a bank account for which WOODS is the sole account holder. As discussed below, the investigation to date has not uncovered any evidence that WOODS ever owned, rented, or lived at 2060 N. Lake Avenue. Additionally, there is evidence to show that 2060 N. Lake Avenue does not exist as a property address.

### IV. **STATEMENT OF PROBABLE CAUSE**

#### A.   **The California Wildfires**

9.   As was reported in numerous international, national and local media reports, in early January 2025, a series of destructive wildfires (the "California Wildfires") spread throughout the Los Angeles metropolitan area in California. These fires cumulatively burned nearly 60,000 acres of land, killed 29 people, forced more than 200,000 people to evacuate, and destroyed more than 16,000 structures. The largest of these fires were the Eaton and Palisades wildfires, which are second and third most destructive wildfires in California history.

10.   Based on my review of a "4856-DR-CA-Initial Notice" provided by FEMA, I know that on January 8, 2025, President Biden

approved a Major Disaster Declaration for California in response to the California Wildfires under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 et seq.

11.    From my involvement in this investigation, I know that FEMA is an agency within DHS. FEMA's primary purpose is to coordinate the response to a disaster that has occurred in the United States and that overwhelms the resources of local and state authorities. In response to the California Wildfires, FEMA made available a program to provide financial assistance to affected individuals and families. Affected persons could apply for assistance online, with the FEMA mobile application, applying at a disaster relief center or by calling the FEMA Helpline. Victims of the California Wildfires, including renters who lost their rental residences, could qualify for a one-time payment of $750 noted as a FEMA relief payment, $43,600 for other needs assistance (personal property, transportation, medical, etc.), and housing assistance for up to 18 months at varying rates (1BR $2,081, 2BR $2,625, 3BR $3,335, 4BR $3,698). Homeowners are also potentially eligible for additional relief up to $43,600 for home repair.

### B.    WOODS's Submission of Fraudulent Claims for FEMA Benefits Related to the California Wildfires

12.    According to FEMA records, FEMA's Fraud Investigations and Inspections Division ("FIID"), and documents from Choice Financial Group, I learned the following:

a.   A claim for federal disaster assistance (the "Application") was submitted on January 30, 2025, over the telephone, listing 2060 N. Lake Avenue in Altadena, California 91001, as the purportedly damaged dwelling (the "2060 N. Lake Avenue address") that the applicant claimed to have rented and live in as her primary residence. The Application identified WOODS as the applicant with a social security number ending in 6017, a date of birth in November 1991, and the primary cellular telephone as (414) 526-0949 (the "0949 Number"). As noted below, the social security number and date of birth used in the Application correspond to WOODS's actual personal identifying information based on law enforcement databases.

b.   On January 31, 2025, WOODS submitted to FEMA a copy of her Arizona driver's license via the internet. WOODS's driver's license listed an address of 45579 W. Dutchman Drive, Maricopa, Arizona 85139.

c.   On January 31, 2025, WOODS submitted to FEMA, via the internet, a copy of her social security card ending in 6017 in her name, Katrina Woods, which matched the social security number provided by WOODS in the Application.

d.   On January 31, 2025, in an attempt to provide proof of her occupancy at the 2060 N. Lake Avenue, WOODS submitted to FEMA, via the internet, a purported bill dated February 15, 2025, from AT&T that listed her name as "KATRINA WOODS" with "2060 N LAKE AVE ALTADENA CA 91001 APT 3" as the address on the AT&T bill that WOODS provided. The name on the bill was WOODS.

e.    On February 6, 2025, in an attempt to provide proof of her occupancy at the damaged property, WOODS submitted to FEMA, via the internet, a purported bank statement from Navy Federal Credit Union dated December 24, 2025, to January 20, 2025, that listed her name as "Katrina Woods" with "2060 N Lake Ave Altadena, CA 91001-5134" as her address on the Navy Federal Credit Union statement that WOODS provided. FEMA's Fraud Investigations and Inspections Division spoke on the phone with a Navy Federal Credit Union representative who stated that the bank statement that WOODS submitted to FEMA had been altered and that the address on the bank statement was not the address that the bank had on file for WOODS.

f.    Based on my review of bank account information from Choice Financial Group, I learned that WOODS received the following FEMA benefits in connection with the Application: (1) on February 13, 2025, a direct deposit of $770 for Other Needs Assistance; and (2) on February 14, 2025, direct deposits of $3,822 for Eligible Critical Needs Assistance and $12,355.03 for personal property loss. The funds were electronically transferred from the United States Government to Choice Financial Group, checking account number ending in 4059 (the "Choice 4059 Account") that was provided by WOODS in the Application. Choice Financial Group records show that WOODS is the sole owner of the Choice 4059 Account and that the address associated with the account is 45579 W. Dutchman Drive, Maricopa, Arizona 85139. This address matched the address on WOODS's above-referenced Arizona driver's license.

g.    On February 20,2025, FEMA uploaded a hotel booking receipt for Avantstay that WOODS submitted for reimbursement from FEMA for $3,273.03. The receipt showed WOODS stayed at the Avantstay from January 9, 2025, to January 30, 2025. The receipt showed it was emailed from Avantstay to WOODS at email address katrinawoods8@gmail.com.

13.    As set forth in more detail below, information obtained during the investigation indicates the Application included materially false statements, and that it was WOODS herself (and not someone pretending to be WOODS) who submitted the Application. This information includes the following:

a.    As described further below, WOODS did not reside at the 2060 N. Lake Avenue address, and further, the 2060 N. Lake Avenue address did not exist.

b.    The mailing address listed on the Application is 45579 W. Dutchman Drive, Maricopa, Arizona 85139, which matches the address on WOODS's Arizona driver's license.  DHS databases show WOODS was issued an Arizona Driver License, number U54048567, on July 1, 2024, with her residence listed at the address of 45579 W. Dutchman Drive, Maricopa, Arizona 85139.

c.    According to law enforcement databases, the social security number and date of birth listed on the Application match those for WOODS.

d.    The phone number on the Application is the 0949 Number, which, according to law enforcement databases, is associated with WOODS.

e.    Choice Financial Group bank records show that: (1) WOODS is the sole account holder of the Choice 4059 Account into which FEMA funds were to be electronically deposited as requested in the Application; and (2) WOODS's address of 45779 W. Dutchman Drive, Maricopa, Arizona 85139, is listed on the Choice 4059 Account.

C.    **WOODS's Claims for Benefits Were False and Fraudulent Because WOODS Did Not Reside at the Purportedly Damaged Property and the Purportedly Damaged Property Did Not Exist as a Dwelling Address**

14.    I obtained the following information from FIID:

a.    On February 20, 2025, a FIID investigator contacted AT&T to verify the authenticity of the above-referenced AT&T bill and was informed that the bill submitted by WOODS had been altered and that the address on the bill was not associated with the account number listed on the bill.

b.    On February 20, 2025, a FIID investigator spoke with a Navy Federal Credit Union representative who stated that the bank statement that WOODS submitted to FEMA had been altered and that the address on the statement, the 2060 N. Lake Avenue address, was not the address that the credit union had on file for WOODS.

15.    On March 7, 2025, I conducted three telephonic conversations with WOODS in which I identified myself as a FEMA subcontractor.

a.    During the first conversation:

i.    I called the phone number listed on WOODS's Application, the 0949 Number, and asked to speak with Katrina

WOODS. The person answering the call identified herself as WOODS. WOODS said she had just been on the phone with FEMA and was on hold regarding her hotel stay. WOODS said she was staying at the hotel that was provided for by FEMA in downtown Los Angeles.

        ii.  During the telephone call, I learned that WOODS had access to FaceTime video calls on her Apple iPhone. I subsequently switched to FaceTime video call with WOODS. I then reviewed the Application with WOODS. WOODS confirmed the 2060 N. Lake Avenue address was the address for the damaged property. WOODS confirmed that FEMA provided her funds through the Choice 4059 Account. WOODS confirmed that she verified her identification with FEMA using the Navy Federal Credit Union account.

        iii. WOODS stated she left Arizona and moved to California because her son died, and she lost everything. Woods said she was a renter at the 2060 N. Lake Avenue address and moved there at the end of November 2024 and resided there until the time of the fires. WOODS confirmed that she currently resided at the Level One Hotel. WOODS said she made the hotel reservation on the FEMA hotel site. WOODS said she entered the disaster number in the system, and it searched for hotels. WOODS said she also had to enter her application number and provide a signature. WOODS confirmed FEMA received the invoice for the hotel. I captured a still photo from the video call of WOODS during the conversation, as pictured below:



b.   During the second conversation which took place on a FaceTime video call:

i.    I called WOODS on FaceTime at the 0949 Number and asked WOODS to show me her driver's license for identification purposes. I then took a screenshot, as pictured below. The address of 45579 W. Dutchman Drive, Maricopa, Arizona 85139 on WOODS's driver's license matches the address listed on WOODS's Choice 4059 Account:



c.   During the third conversation which took place on a FaceTime video call:

11

i.    I called WOODS on FaceTime at the 0949 Number, and I asked WOODS to show me her driver's license again as her date of birth had not shown in the last call. I captured a still photo of WOODS's driver's license, as pictured below, that shows a date of birth of November 28, 1991, which matches the date of birth provided on the Application submitted by WOODS:



16.    On March 8, 2025, I received a text message from WOODS from the 0949 Number asking about hotel reimbursement for her stay at the Avantstay for 22 nights.  WOODS told me "it was like 3200" and also stated that she uploaded the receipt to FEMA as well.

17.    On March 10, 2025, per my recommendation, FEMA discontinued lodging for WOODS at the Level Hotel and Furnished Suites in Los Angeles, California.

18.    On March 10, 2025, I received a text message from WOODS using the 0949 Number, who stated:

i.    "The hotel stay is not supposed to be up until the 14th, but I just went down because when I called Fema they said in the system that it is good until March 27 so when I

went to the front desk, they said as of today payments will no longer be made from Fema that you guys terminated my lodging."

        ii.  WOODS texted me on another number, 520-728-3131, stating she was WOODS and had to use her daughter's phone because her cell phone would not let her send pictures.  WOODS texted a document titled "CLC Lodging" with a FEMA logo.  The documented stated that a payment termination had been issued for WOODS.

    19.  On March 11, 2025, I received a text message from WOODS from the 0949 Number, asking if there were any updates for her.

    20.  On March 19, 2025, I received a text message from WOODS from the 0949 Number, asking if there were any updates for her.

    21.  On March 24, 2025, I conducted a telephonic interview of D.G. Based on records from the Los Angeles County Registrar-Recorder's Office ("Recorder's Office"), D.G. is the owner, as Trustee, of 2058 Lake Avenue, Altadena, California and 2068 Lake Avenue, Altadena, California.

    22.  D.G. stated that he was the property owner of 2058 N. Lake Avenue and 2068 N. Lake Avenue in Altadena, California. D.G. stated that the damaged property at 2060 N. Lake Avenue in Altadena did not exist.  Based on my search of records for 2060 N. Lake Avenue at the Recorder's Office, there were no results for the 2060 N. Lake Avenue address.

    23.  Based on my search at the Los Angeles County Assessor's Office ("Assessor's Office") for tax bills for the

2060 N. Lake Avenue address, there were no results for the 2060 N. Lake address. I also had the Assessor's Office search for 2060 N. Lake Avenue, Altadena, California, and there were no results for tax records for the 2060 N. Lake address. I subsequently searched the CLEAR database for 2060 N. Lake Avenue and confirmed there were no results for the damaged property address.

24.  On March 26, 2025, I received a text message from WOODS from the 0949 Number, asking if there were any updates for her.

25.  According to a law enforcement database, WOODS has had addresses in Arizona and Wisconsin and California. The California address was 912 W. Laurel Street, Compton, California 90220 and was dated May 2021. Additionally, DHS databases show WOODS was issued a driver's license in Arizona with the number U54048567 on July 1, 2024, with a residence address of 45579 W. Dutchman Drive, Maricopa, Arizona 85139, which address matched the address on the driver's license that WOODS showed me during the above-referenced FaceTime video call. The DHS databases showed no results for Katrina M. Woods as having a driver's license issued in California. Additionally, the California Department of Motor Vehicles showed no vehicles registered to the 2060 N. Lake Avenue address.

**D.  WOODS's Use of a Digital Device and Probable Cause that Evidence of the Subject Offenses Will be Found on WOODS and Digital Devices in Her Control**

26.  Based on my review of FEMA's records, specifically the "Case Review/Applicant Information" logs relating to the

Application, WOODS's contacts with FEMA, and my investigation in this case, I learned the following:

a.   On January 31, 2025, WOODS called FEMA to request baby formula and to check the status of her case.

b.   On January 31, 2025, WOODS called FEMA to request Transitional Shelter Assistance as she had been evacuated from the damaged property and was running out of funds for a hotel.

c.   On February 1, 2025, WOODS called FEMA to check the status on her application.

d.   On February 1, 2025, a remote inspection was conducted for WOODS's case.

e.   On February 1, 2025, WOODS verified her identification via a video call with a FEMA inspector.  I interviewed FEMA Inspector Lance Maeda who stated he did not have a specific recollection at the time I spoke to him of a remote inspection with WOODS.  He stated that, in general, when a remote inspection is done, identification is verified, and it is typically done if the property was said to be destroyed.

f.   On February 3, 2025, WOODS called FEMA to check the status of her application.

g.   On February 4, 2025, WOODS called FEMA to complain about issues with the hotel after she was approved for Transitional Shelter Assistance through FEMA.

h.   On February 5, 2025, WOODS called FEMA to check the status of her application and essential needs assistance.

i.   On February 7, 2025, WOODS called FEMA to check the status of her application.

   j. On February 9, 2025, WOODS called FEMA to ask about a Transitional Shelter Assistance extension.

   k. On February 10, 2025, WOODS called FEMA to check the status of her application and confirmed that her electronic funds transfer information was correct on file.

   l. On February 13, 2025, WOODS called FEMA to check the status of her application.

   m. On February 14, 2025, WOODS called FEMA to check the status of her application.

27. As noted above, I was able to successfully contact WOODS using the 0949 Number.  WOODS stated she had an iPhone, and I was able successfully have multiple FaceTime video calls with her. Based on my training and experience, I understand that individuals involved in illegal activities, such as the Subject Offenses, may use digital devices, including cellular telephones, to further their illegal schemes.

28. I understand from my training and experience that individuals committing financial crimes often use and maintain personal digital devices to store information about their crimes during and long after the crimes have been committed.  This information includes logs of transactions or browsing history; call logs; copies of documents submitted electronically; copies of applications for government benefits; records of funds received; information regarding individuals and companies that have been victimized; records of payments to or from co-conspirators; and victim profiles.

29.  I understand individuals who commit financial crimes often access financial account information using their personal digital devices, including through applications offered by financial institutions, and these devices will store records concerning their finances and financial transactions, sometimes for substantial periods long after they are last accessed.

30.  I understand individuals who commit financial crimes will often liquidate criminal proceeds to cash or cash equivalents (such as jewelry or precious metals), as well as using criminal proceeds to purchase or finance automobiles, real estate, and other types of property and assets, in order to launder the proceeds, to make the proceeds more difficult to trace, and to profit from the criminal activity.  Information concerning a subject's finances, including expenditures and purchases, and other financial information concerning income and work activity, is also evidence of criminal activity to the extent that persons involved in criminal activity do not have legitimate sources of income to support expenditures and purchases.

## V.  **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**[1]

31.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such
*(footnote cont'd on next page)*

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  32. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

   a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult

to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

33.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

   c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress WOODS's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of WOODS's face with her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

  34. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. REQUEST FOR SEALING

  35. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of these applications, including the application and the complaint and search warrant affidavit. I believe that sealing is necessary because the items and information to be seized is relevant to an ongoing investigation into criminal conduct involving WOODS who is unaware that they are being investigated. In addition, some of her suspected criminal activity may have been facilitated by other co-conspirators. Disclosure of the complaint and search warrant affidavit at this time would seriously jeopardize the investigation, as such disclosure may provide an opportunity to destroy evidence, change patterns of behavior, or allow flight

from prosecution. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on this continuing investigation and may severely jeopardize its effectiveness.

## VI. <u>CONCLUSION</u>

36. For all the reasons described above, there is probable cause to believe that WOODS violated 18 U.S.C. § 1040 (Fraud in Connection with Major Disaster or Emergency Benefits) related to the California Wildfires.

37. Further, based on WOODS's submission of a fraudulent application for FEMA benefits by telephone there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found on the SUBJECT PERSON, as described in Attachment A.

_____
ROXANNA DALE
Special Agent
Department of Homeland Security
Officer of Inspector General

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 17th day of
April, 2025.

_Karen L. Stevenson_
_____
HONORABLE KAREN STEVENSON
UNITED STATES MAGISTRATE JUDGE